**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

CASE NO. 3:10-cr-298-J-25TEM

v.

AKINTUNDE AKINLADE

_____

## REPORT AND RECOMMENDATION[1]

This matter comes before the Court on Defendant Akintunde Akinlade's Motion to Suppress Evidence and Statements (Doc. #38, Motion) and the government's response in opposition thereto (Doc. #41).  A hearing was held before the undersigned on February 14, 2011 (Doc. #43, Minutes).  A transcript of the hearing has been filed (Doc. #55) and will hereinafter be referred to as "Tr." followed by the appropriate page number.[2]

Subsequent to the hearing, Defendant was permitted to file, and filed, a supplemental brief in support of the Motion (Doc. #48).  Likewise, the Court permitted the government to file a supplemental response, which it did on March 11, 2011 (Doc. #51). For the reasons stated herein, the undersigned respectfully recommends that Defendant's Motion be denied.

_____

[1]Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS after service of this Report and Recommendation.  Failure to file a timely objection waives a party's right to review.  *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; Local Rule 6.02, United States District Court for the Middle District of Florida.

[2]It should be noted that the docket entry pagination reflects different pagination than that of the transcript.  Therefore, for the sake of continuity, the undersigned will cite the page numbers referenced on the transcript.

## I. Background

On March 24, 2010, a criminal complaint was lodged against Defendant (Doc. #1, Complaint).  The Complaint alleges Defendant violated Title 18, United States Code, Section 1344, for knowingly executing, or attempting to execute, a scheme or artifice to defraud a banking institution insured by the Federal Deposit Insurance Corporation ("FDIC") (Doc. #1).  On December 9, 2010, Defendant was subsequently charged by a twelve (12) count indictment (Doc. #27, Indictment).

At the hearing, the following three witnessed testified for the government: (1) Gwinnett County Police Officer A.M. Kelly; (2) Gwinnett County Police Officer Justin Von Behren; and (3) United States Postal Inspector Adam Schaefer (Doc. #43).  Defendant neither testified at the hearing, nor did he present witnesses to testify on his behalf (Doc. #43).  The following pertinent facts were established by the testimony presented at the hearing.  Specifically, at some point prior to March 2010, Inspector Schaefer issued a "BOLO"[3] for an unidentified male suspected of bank fraud (Tr. 85-87; Doc. #43, Government's Exhibit 1).

The "BOLO" contained several surveillance photographs of the suspect, gave a brief description of the suspect, the crimes committed, where the crimes were being committed, and a description of the vehicle the suspect was believed to be driving, including, *inter alia*, the license plate number  (Doc. #43, Government's Exhibit 1).  The BOLO also contained a surveillance photograph of the suspect's vehicle, which was a silver 2006 Nissan Maxima (Doc. #43, Government's Exhibit 1).  The BOLO was disseminated throughout the greater

---

[3]"BOLO" is an abbreviation of the phrase: "be on the lookout for."

2

southeast area where the majority of the fraudulent activity was occurring (Tr. 87).

On March 12, 2010, a bank officer of the Flagstar Bank in Gwinnett County, Georgia, Mr. Keenan Haines,[4] called Inspector Schaefer to report that a person resembling the subject of the BOLO had been in his banking center attempting to open both personal and business bank accounts under the name "John Paul Mozingo" (Tr. 88-89). Mr. Haines relayed to Inspector Schaefer that after he advised "Mr. Mozingo" that additional identification would be required to open the accounts, "Mr. Mozingo" stated he would return later with the necessary identification (Tr. 89). Inspector Schaefer told Mr. Haines that if the individual returned to the bank, Mr. Haines should immediately contact local law enforcement (Tr. 89). Later that afternoon, "Mr. Mozingo" returned to the Flagstar Bank, whereupon bank employees contacted the Gwinnett County Police Department (*see* Tr. 8).

Officer Kelly testified that, on the afternoon of March 12, 2010, she received a dispatch advising her that a male with "active warrants" for identity fraud was believed to be at the Flagstar Bank (Tr. 8). Officer Kelly was the first law enforcement officer to arrive on the scene (Tr. 9). Once at the bank, she was shown the BOLO and some paperwork that "Mr. Mozingo" had filled out regarding the opening of the bank accounts, *supra* (Tr. 9). Officer Kelly observed the individual sitting in Mr. Haines' office and compared him to the photograph in the BOLO.[5] Since the suspect closely resembled the subject of the BOLO, and since he was large in stature, Officer Kelly decide to wait for a back-up officer to arrive before proceeding with the investigation (Tr. 10).

---

[4]The transcript of the hearing also refers to Mr. Haines as "Mr. Hayes" (*see e.g.*, Tr. 9, 11, 35, 20, 57, 65, 76). For the sake of continuity, the undersigned will refer to this individual as "Mr. Haines."

[5]Officer Kelly testified that Mr. Haines' office is enclosed primarily with glass; therefore, it was possible to observe the suspect from the bank lobby (Tr. 73).

Officer Von Behren  subsequently arrived on the scene (Tr. 11).  Officer Von Behren was shown the BOLO and he concurred with Officer Kelly that the individual in Mr. Haines' office resembled the individual who was the subject of the BOLO (Tr. 11, 45, 56).  The two officers then entered Mr. Haines' office in order to inquire into the suspect's identity (Tr. 11, 57).  Once in Mr. Haines' office, the officers ask Defendant if he would allow one of them to pat him down for officer safety reasons (Tr. 11, 47, 58).  Defendant consented to the officer safety pat-down (Tr. 11, 47, 58).  Officer Kelly testified that, while Officer Von Behren patted Defendant down, Defendant became "fidgety" and would not stay still (Tr. 11).[6] Defendant asked the officers if he was under arrest (Tr. 120).  Officer Kelly responded to Defendant that he was not under arrest, but that he needed to be detained for further investigation (Tr. 12, 62).  Officer Kelly testified that she was aware that the BOLO advised law enforcement to detain the suspect and attempt to positively identify him before calling the United States Postal Inspector (Tr. 12, 61; *see also* Government's Exhibit 1).

Based on Defendant's size, nervous behavior, and the fact he appeared to be the suspect pictured in the BOLO, the officers decided to handcuff Defendant during the investigatory detention (Tr. 12, 27-28, 75-76).  When Officer Von Behren pulled out his pair of handcuffs, Defendant stepped away from Officer Von Behren and attempted to head toward the door (Tr. 12).  The officers tried to stop Defendant from leaving; however, Defendant pushed the officers out of the way and ran out into the bank lobby, where an altercation between himself and the officers ensued (Tr. 12).  In an effort to subdue

---

[6]Officer Von Behren testified that, in addition to being fidgety and appearing nervous, Defendant's upper-body "tensed" as he began to pat him down (Tr. 74-75).  Officer Von Behren testified that in his experience such tensing is "generally indicative of people wanting either to fight or run" (Tr. 75).

Defendant, Officer Kelly pulled out her Taser device (Tr. 12).   While Office Von Behren struggled with Defendant, he yelled out "shoot him" and Officer Kelly deployed her Taser (Tr. 48).  She fired once, and Defendant fell at the inner set of doors in the entranceway of the bank (Tr. 12, 48).  Defendant, however, was not completely subdued by the Taser and continued to crawl toward the exit, kicking at Officer Von Behren (Tr. 12, 48). Consequently, Officer Kelly engaged Defendant a second time with the Taser, and then tried to handcuff him (Tr. 13).  Defendant still would not comply and eventually fought his way outside of the bank (Tr. 49).   Officer Von Behren testified as follows:

> I pursued him [Defendant].  He made it to the outside.  By the time I caught up to him, he had made it through the exit, the outer set of doors.  Since that level of force [the Taser] had failed to subdue the subject and the Taser was not immobilizing him, I went to the next level of force and went to punch him. As I approached him, he kicked me and was still actively resisting. [ . . . ]  He was laying on his back and kind of scooting across the ground, and he picked his right leg up and basically horse kicked me right into the—my left thigh.

(Tr. 49).

The officers were eventually able to call for additional back-up, and handcuff Defendant (Tr. 50-51).  Officer Kelly then placed Defendant in the backseat of her patrol vehicle in order to transport him to the Gwinnett County jail (Tr. 13-14, 51).  Officer Kelly did not read Defendant *Miranda* warnings (Tr. 16), nor was she aware that any other officer read Defendant such warnings (Tr. 17).

While in the backseat of her patrol vehicle, Defendant asked Officer Kelly how much trouble he was in (Tr. 14); to which, she responded that he was being charged with two counts of obstruction of a police officer with respect to the fight that occurred in the bank (Tr. 14).  Officer Kelly also advised Defendant that other jurisdictions were involved and that he may possibly be charged with financial identity fraud (Tr. 14-15).  Officer Kelly

5

testified that Defendant responded to her statement by saying: "I'm screwed" (Tr. 14-15). Officer Kelly testified that after Defendant had been arrested the only questions she asked him were related to preliminary information, such as his name, date of birth, height, weight, and country of origin (Tr. 15-16, 31).  In response to the request for his name, Defendant responded that his name was "Peter Akinlade" (Tr. 31).  In addition, Officer Kelly testified that, while being transported to the jail, one of Defendant's four cellular telephones rang and Defendant asked Officer Kelly who was calling (Tr. 15, 32).  Officer Kelly stated that she looked at the ringing telephone and told him that its display indicated that the caller was an individual by the name of "Flav" (Tr. 15).  Defendant responded that "Flav" was "just a friend," and asked her if she could look at his contacts under the word "Mom," and call his mother for him (Tr. 15).  Officer Kelly testified that she responded by asking Defendant what name he wanted her to use for him when speaking with his mother (Tr. 15).  To which, Defendant responded: "Mike" (Tr. 15).  Officer Kelly stated that she then made the comment, "[w]ell, you seem to have a lot of names," and he stated: "Yea, I've gone by several names" (Tr. 15-16).

Officer Von Behren stayed at the scene and located a vehicle in the bank parking lot which matched the description of the vehicle referenced in the BOLO (Tr. 52-53).  The BOLO identified the suspect's vehicle as a 2006 silver Nissan Maxima, bearing Georgia tag number BKF 8636 (Government's Exhibit 1).  The BOLO contained the vehicle identification number ("VIN") and provided that the vehicle was registered to a Randy Glover of 1500 Scenic View Trace, Lawrenceville, Georgia 30044 (Government's Exhibit 1).  The BOLO also referenced Randy Glover's Georgia driver's license number, which was noted to be a fraudulently obtained driver's license (Government's Exhibit 1).  Officer Von Behren

6

testified that he compared the vehicle to the information contained in the BOLO, ran the license plate number through dispatch, and determined that the vehicle was indeed the vehicle referenced in the BOLO (Tr. 52-53).

Officer Von Behren stated that he decided to impound the vehicle and either obtained the keys to the vehicle by way of the arrest or from Mr. Haines' office (Tr. 65-67). Officer Von Behren opened the vehicle and, pursuant to departmental policy, performed an initial cursory check of the vehicle at the scene in order to determine whether any items of value were contained therein (Tr. 67). Officer Von Behren then had the vehicle transported to the police impound lot where it was inventoried (Tr. 69-70).

Defendant was subsequently identified as Akintunde Akinlade, an illegal immigrant from Nigeria. All of the aforementioned information was relayed to Inspector Schaefer, who prepared an affidavit and application for a search warrant of the vehicle in Gwinnett County, which was granted by a federal magistrate judge in the Northern District of Georgia on April 20, 2010 (Doc. #S-1). Pursuant to the search, Inspector Schaefer recovered numerous pieces of incriminating evidence, cellular telephones, computer thumb drives, and a laptop computer. All of the evidence was taken to Jacksonville, Florida, where Inspector Schaefer obtained an additional search warrant, on May 25, 2010, to search the contents of the cell phones, thumb drives, and laptop computer (Doc. #S-2). As a result, more incriminating evidence was discovered, including a plethora of stolen identities of people living in the United States (Doc. #51 at 3).

## II. Discussion

Defendant moves the Court for entry of an order suppressing from introduction into evidence any and all evidence obtained and/or seized as a result of the alleged

unconstitutional investigatory stop/detention of Defendant, including any and all subsequent statements made by or attributed to him (Docs. #38 and #48).  Defendant argues that his investigatory detention lacked both probable cause and reasonable suspicion; thus, he claims it violated his rights under the Fourth Amendment (Docs. #38 and #48).  Defendant did not testify at the hearing and the undersigned finds the testimony of the witnesses at the hearing to be credible.

In support of the Motion, Defendant argues: (1) that the officers did not have the requisite reasonable suspicion to detain him when they attempted to stop him from leaving the Flagstar Bank in Gwinnett County; (2) that the officers did not have probable cause to arrest him; (3) that the officers lacked authority to search his vehicle, or to impound and inventory the vehicle; and (4) that any statements he made as a result of the his arrest should be suppressed as evidence (Docs. #38 and #48).

The United States responds there was reasonable suspicion for Defendant's detention and that probable cause for arrest was present after he attempted to flee from the officers (Docs. #41 and #51).  Further, the United States argues that Defendant's vehicle was properly impounded and inventoried pursuant to departmental policy, and that it was searched only after a warrant had been obtained (Docs. #41 and #51).

The Supreme Court of the United States has held that a police officer may, consistent with the Fourth Amendment, briefly stop an individual who appears to be engaged in criminal activity if the officer has a reasonable and articulable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  When determining whether reasonable suspicion exists, "the court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for

suspecting legal wrongdoing." *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (*internal quotation marks omitted*).  Though there must be an objective basis for suspecting wrongdoing, officers may assess the facts in light of their unique training, expertise, and experience in the field.  *United States v. Arvizu*, 534 U.S. 266, 273-75 (2002).  Reasonable suspicion exists if the cumulative information of which the detaining officer is aware suggests criminal activity, even if each fact, viewed in isolation, can be given an innocent explanation.  *Id.*

Moreover, the Supreme Court held in *United States v. Hensley*, 469 U.S. 221 (1985) that a flyer issued by another law enforcement department, based on articulable facts that the person has committed an offense, can provide the necessary reasonable suspicion justifying a stop to check identification, pose questions to the person, or "to detain the person briefly while attempting to obtain further information."  *Id.* at 232.

The "BOLO" flyer in the instant case contained sufficient detail of a fraudulent checking account scheme that involved checks in the amounts of $30,000 to $50,000.  The BOLO also included photographs and descriptions of both Defendant and his vehicle (Government's Exhibit 1).  The flyer referenced the name of the Postal Inspector who issued the BOLO, his telephone number, and requested that the Inspector be called after the suspect (whose name was not known) had been detained and positively identified (Government's Exhibit 1).

Based on the fact Defendant matched the individual that was the subject of the BOLO (*see* Tr. 11), the undersigned finds the officers had the requisite reasonable suspicion to conduct the *Terry* stop of Defendant in the bank.  Although Defendant first appeared to cooperate with the *Terry* stop by permitting a frisk for weapons, once he saw

handcuffs he quickly attempted to leave the bank and resisted the officers, pushing and kicking them when they attempted to stop him.

In *Hensley*, the Supreme Court held that stopping and briefly detaining a person based on information from another law enforcement agency's "flyer" does not violate the Fourth Amendment.  469 U.S. at 232.  The Court stated:

> We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a [*Terry*] stop. . . .

*Id.*

The Court additionally stated; "where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." *Id.*  The facts in this case are similar to the facts of *Hensley*.

In this instance, the Gwinnett County police officers had a right to question Defendant about the circumstances of the "BOLO".  When Defendant acted nervous and attempted to flee, the officers had additional reason(s) to believe he was the subject of the "BOLO."  When Defendant refused to cooperate with the officers and engaged in flight by use of force, the officers then acquired the requisite probable cause to arrest Defendant for felony police obstruction, as distinguished from any federal offense.  *See Ga. Code §* 16-10-24.

Defendant argues that the only activity he was engaged in was attempting to open bank accounts as a bank customer (Doc. #48 at 5).  The undersigned, however, finds the

10

information disseminated to the police officers by dispatchers, combined with the information contained in the BOLO, and the officers' personal observations (in light of their training and past experience) provided the requisite reasonable suspicion to conduct a lawful investigatory detention of Defendant in order to resolve the fact that he matched both the description in the BOLO and the surveillance photograph contained therein.

> Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.

*Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (*internal citations omitted*).

With respect to the information contained in the BOLO, the undersigned would note that what is known as the "fellow officer rule" imputes the collective knowledge of police investigating a crime to each member, and each officer need not have independent personal knowledge, so long as there has been some communication between the officers. *See State v. Peterson*, 739 So.2d 561, 565 (Fla. 1999); *see also Alderman v. McDermott*, No. 6:03-cv-41-ACC, 2004 WL 1109541, at *6, n. 93 (M.D. Fla. Apr. 27, 2004).[7] "Reasonable suspicion is determined from the totality of circumstances and collective knowledge of the officers." *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006).

Concerning Defendant's motion to suppress the incriminating statements made to Officer Kelly when he had not been *Mirandized*, the undersigned finds the motion is due to be denied. The evidence reveals the statements Defendant made were spontaneous

---

[7]Unpublished opinions are not considered binding authority; however, they may be cited as persuasive authority pursuant to the Eleventh Circuit Rules. 11th Cir. R. 36-2.

and were blurted out voluntarily.  As such, these statements need not be suppressed.  *See* *U.S. v. Smith*, No. 1:07-cr-54-WSD, 2008 WL 746546, at *7 (N.D. Ga. March 18, 2008). *Miranda* warnings are necessary prior only to custodial *interrogation*.  *Miranda v. Arizona*, 384 U.S. 436, 445-46 (1966) (*emphasis added*).

Officer Kelly's testimony reveals that she was not interrogating Defendant (*see* Tr. 15-16, 31).  Officer Kelly merely asked Defendant preliminary information, such as his name, date of birth, *etc.* (*see* Tr. 15-16, 31).  Defendant asked Officer Kelly what he was being charged with, and when she responded he said "I'm screwed" (Tr. 14-15).  Officer Kelly did not solicit this statement from Defendant.  When Defendant asked Officer Kelly to call his mother, she responded by asking who she should say was calling; to which, he responded "Mike" (Tr. 15 ).  Since Officer Kelly was aware that Defendant referred to himself as both "John Paul Mozingo" and "Peter Akinlade," she merely responded that it appeared he went by several names; to which, Defendant responded: "Yea, I've gone by many names."  Officer Kelly was not interrogating Defendant.  The fact she did not *Mirandize* Defendant does not require that his spontaneous statements be suppressed as evidence in this case.

Defendant argues that the impounding of his vehicle violated the Gwinnett County Police Department Directives Manual, Sections 427.01through 427.09 (Doc. #43).  On March 14, 2011, the Court directed the parties to file the subject policy provisions regarding Gwinnett County's impound procedures (Doc. #52, Order).  On March 24, 2011, the parties filed said policy provisions (Doc. #54-1).  The premise of Defendant's argument in this regard is based on the fact the noted policy provisions provide that an arrestee's vehicle should not be arbitrarily impounded if a suitable custodian can be located to take

possession of the vehicle (*see* Doc. #54-1 at 1-2, Section 427.03).   An exception to this provision exists, however.  Section 427.05 provides that a vehicle may be impounded and placed on a "hold" if the vehicle itself is evidence of a crime, or if the vehicle is needed as part of an ongoing investigation (Doc. #54-1 at 2).  Such is the case here.  In addition, since the BOLO specified that the vehicle was registered under a fraudulently obtained driver's license, finding a suitable custodian would not have been feasible for Officer Von Behren, as it was unknown who the true owner might be (*see* Government's Exhibit 1).  Moreover, there is no evidence that a request was made for the vehicle to be released to a suitable custodian.

Defendant also cites *Arizona v. Gant*, 129 S. Ct. 1710 (2009) in support of his argument that Officer Von Behren's cursory inventory check of the contents of the vehicle was illegal (Doc. #48 at 7).  The *Gant* Court stated: "Because police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein, the search in this case was unreasonable."  129 S. Ct. at 1713.  The premise of Defendant's argument rests on the fact that he was arrested for obstruction of a police officer and, therefore, a search of his vehicle could not reasonable reveal any additional evidence of this crime (Doc. #48 at 7-8).

While this may be true, Officer Von Behren's impounding of the vehicle was reasonable as it matched the exceptionally detailed description in the BOLO, and was properly impounded pursuant to departmental policy as part of an ongoing investigation. *See* Doc. 54-1 at 2, Section 427.05; *see also Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) ("the critical question in cases such as this is not whether the police needed

13

to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason"). Moreover, the *Sammons* court noted "as long as 'reasonable police regulations relating to inventory procedures [are] administered in good faith' and 'according to standardized criteria,' the Fourth Amendment is satisfied."' *Id.* (*quoting Colorado v. Bertine*, 479 U.S. 367, 374 n. 6 (1987)).   Here, the Gwinnett County Police Department Directives Manual, Section 427.06, provides that, before impound, the vehicle is to be inventoried (Doc. #54-1 at 2).  In addition, apart from the cursory inventory of the items in the vehicle, it was not searched until a search warrant was obtained.

Accordingly, the undersigned finds Officer Behren's impounding and inventorying of the vehicle was reasonable under the circumstances and was properly conducted pursuant to departmental policy.  Therefore, no Fourth Amendment violation occurred in this instance.

### III.  Conclusion

For the reasons stated herein, the undersigned **hereby RECOMMENDS that:**

Defendant's Defendant's Motion to Suppress Evidence and Statements (Doc. #38) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida this 21st day of April, 2011.


Copies to all counsel of record

**THOMAS E. MORRIS**
United States Magistrate Judge

14